## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *IN RE* SUBPOENA TO PAUL B. GOLDBERG<br><br>Paul B. Goldberg<br>3821 Woodley Rd. NW<br>Washington, DC 20016<br><br>Non-Party Movant. | **MISC. CASE NO. _____** |
| IN RE AMGEN SECURITIES LITIGATION | **C.A. NO. 07-2536 (C.D. Cal.)** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE MOTION OF NON-PARTY PAUL B. GOLDBERG TO QUASH
SUBPOENA AND/OR FOR A PROTECTIVE ORDER,
AND FOR ATTORNEYS' FEES**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

FACTUAL BACKGROUND ............................................................................................ 2

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT .................................................................................................................. 8

I.   AMGEN'S SUBPOENA SHOULD BE QUASHED BECAUSE THE
     TESTIMONY IT SEEKS FROM MR. GOLDBERG IS PROTECTED BY THE
     REPORTER'S PRIVILEGE .................................................................................. 8

II.  AMGEN HAS FAILED TO OVERCOME THE REPORTER'S PRIVILEGE ............. 10

     A.   Amgen Has Not Exhausted Reasonable Alternative Sources for the
          Information It Seeks from Mr. Goldberg. ............................................. 10

     B.   The Testimony Sought from Mr. Goldberg is Not "Crucial." ............................. 13

III. ALTERNATIVELY, THIS COURT SHOULD ENTER A PROTECTIVE ORDER
     PRECLUDING AMGEN FROM INQUIRING INTO MR. GOLDBERG'S
     SOURCES ........................................................................................................... 15

IV. ATTORNEYS' FEES ............................................................................................. 15

CONCLUSION .............................................................................................................. 16

# TABLE OF AUTHORITIES

**Cases**

*Application of Behar,*
  779 F. Supp. 273 (S.D.N.Y. 1991) ......................................................................... 11

*Carey v. Hume,*
  492 F.2d 631 (D.C. Cir. 1974) .............................................................................. 11

*Gonzales v. NBC, Inc.,*
  194 F.3d 29 (2nd Cir. 1998) ................................................................................... 2

*Hatfill v. Gonzales,*
  505 F. Supp. 2d 33 (D.D.C. 2007) .......................................................................... 9

*\*Hutira v. Islamic Republic of Iran,*
  211 F. Supp. 2d 115 (D.D.C. 2002) ....................................................... 9, 10, 11, 13

*In re Amgen Inc. Sec. Litig.,*
  544 F. Supp. 2d 1009 (C.D. Cal. 2008) ............................................................. 5, 14

*In Re Grand Jury Subpoena (Miller),*
  397 F.3d 964 (D.C. Cir. 2005) ................................................................................ 9

*In re McCray,*
  928 F. Supp. 2d 748 (S.D.N.Y. 2013) ................................................................... 11

*In re Petroleum Prods. Antitrust Litig.,*
  680 F.2d 5 (2d Cir. 1982) ..................................................................................... 11

*Krase v. Graco Children Prods.*
  *(In re Application to Quash Subpoena Nat. Broadcasting Co.),*
  79 F.3d 346 (2d Cir. 1996) ................................................................................... 10

*\*Lee v. Department of Justice,*
  413 F.3d 53 (D.C. Cir. 2005) .................................................................... 10, 13, 14

*Lee v. Department of Justice,*
  428 F.3d 299 (D.C. Cir. 2005) .............................................................................. 10

*\*Peck v. City of Boston (In re Slack),*
  768 F. Supp. 2d 189 (D.D.C. 2011) ....................................................... 9, 10, 11, 13

*Saperstein v. Palestinian Auth. (In re Subpoena to Goldberg),*
  693 F. Supp. 2d 81 (D.D.C. 2010) ..................................................................... 7, 15

ii

*Shoen v. Shoen,*
  5 F.3d 1289 (9th Cir. 1993) .................................................................. 10

*\*Tripp v. DOD,*
  284 F. Supp. 2d 50 (D.D.C. 2003)............................................... 8, 9, 11

*U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Co., Inc.,*
  507 F. Supp. 2d 45 (D.D.C. 2007) ........................................................ 13

*\*Zerilli v. Smith,*
  656 F.2d 705 (D.C. App. 1981) ................................................ 9, 10, 11, 13

**Rules**

Fed. R. Civ. P 26(b) ........................................................................................ 7

Fed. R. Civ. P.  26(b)(2) ................................................................................ 7

Fed. R. Civ. P. 26 .......................................................................................... 7

Fed. R. Civ. P. 26(b)(2)(C)(i) ....................................................................... 7

Fed. R. Civ. P. 26(c) ...................................................................................... 7

*Fed. R. Civ. P. 26(c)(1)............................................................................. 8, 15

Fed. R. Civ. P. 26(c)(1)(A)(D) .................................................................... 15

Fed. R. Civ. P. 45 ........................................................................................... 7

*Fed. R. Civ. P. 45(d) ............................................................................... 7, 16

*Fed. R. Civ. P. 45(d)(1) ...................................................................... 8, 15, 16

Fed. R. Civ. P. 45(d)(3) ............................................................................... 15

Fed. R. Civ. P. 45(d)(3)(A)(iii)(iv) ............................................................... 7

Fed. R. Civ. P. 45(d)(3)(B)(i) ........................................................................ 7

Fed. R. Civ. P. 501 ......................................................................................... 9

**Constitutional Provisions**

U.S. Const. amend. I ................................................................................. 7, 8

Paul B. Goldberg is an award-winning journalist and editor-in-chief and publisher of *The Cancer Letter*, a D.C.-based publication that has earned numerous journalism awards for its investigative coverage of issues that shape the field of oncology.  Mr. Goldberg has been subpoenaed by Amgen, Inc. ("Amgen"), one of the largest pharmaceutical companies in the world, to give testimony about his sources for an article he wrote over eight years ago.  In that article, *The Cancer Letter* reported on the disquieting results from a then recently-terminated clinical trial involving Amgen's EPO product.  That article led directly to a Congressional investigation of Amgen and resulted in the FDA placing black box warnings on the labels of the Amgen EPO product and other EPO products–the most serious warning about a pharmaceutical product's safety (other than a product recall) that can be imposed by the FDA.  The black box warning for these drugs was supplemented with an FDA-mandated risk evaluation and mitigation strategy (REMS). Pursuant to the REMS, prior to administration of drugs that include Aranesp, physicians must remind patients that these agents may cause tumors to grow faster, trigger blood clots, heart attacks, heart failure, and stroke, making some patients die sooner.

Subsequently, a class action lawsuit was brought against Amgen relating to its failure to disclose this clinical trial.  Amgen has now subpoenaed Mr. Goldberg, seeking his deposition testimony regarding, *inter alia*, his sources for the article and information concerning his interaction with those sources.  Amgen has served this subpoena (and has refused to withdraw it) despite the fact that it has not yet even attempted to depose the individual sources identified in Mr. Goldberg's article, explaining that subpoenaing Mr. Goldberg is an easier way to get the information that it seeks.

There is no question that under D.C. law parties to a litigation can, in some limited circumstances, turn to journalists for testimony needed in discovery.  But the courts have also

1

recognized that the public would be ill-served if journalists were routinely required to provide

their editorial work product to litigants, even where confidential sources are not involved.  The

policy reasons for that are several, as discussed below, but as one court succinctly put it:

> "If the parties to any lawsuit were free to subpoena the press at will, it would likely
> become standard operating procedure for those litigating against an entity that had been
> the subject of press attention to sift through press files in search of information
> supporting their claims.  The resulting wholesale exposure of press files to litigant
> scrutiny would burden the press with heavy costs of subpoena compliance, and could
> otherwise impair its ability to perform its duties--particularly if potential sources were
> deterred from speaking to the press, or insisted on remaining anonymous, because of the
> likelihood that they would be sucked into litigation."

*Gonzales v. NBC, Inc.*, 194 F.3d 29, 35 (2nd Cir. 1998).

This case is a classic example of the kind in which the courts have recognized that

journalists should not be dragged into litigation.  Subpoenas served on journalists must be

quashed when, *inter alia*, the information sought is available from alternative sources or is not

"crucial" to the subpoenaing party's case.  Amgen has thoroughly failed to demonstrate that the

information sought is not obtainable from the most obvious alternative sources.  Unlike in other

reporter-privilege cases, the subpoenaing party has pointed to <u>no</u> deposition testimony or other

evidence from discovery to establish that a diligent effort has been made by Amgen to get the

materials elsewhere and turned up nothing.  Indeed, Amgen's counsel has affirmatively stated

that he is seeking Mr. Goldberg's testimony because doing that is easier than taking the

deposition of a named source in the Article who lives in Germany.  In addition, Amgen's counsel

has not demonstrated that the explanation sought from Mr. Goldberg is crucial to Amgen's case.

For each of these two reasons, Mr. Goldberg asks this Court to quash the subpoena.

## FACTUAL BACKGROUND

*The Cancer Letter* is an independent weekly newsletter and a leading source of

information on development of cancer therapies, cancer research funding and health care finance,

legislation and policy.  Its audience includes faculty and staff members at cancer centers,

pharmaceutical and biotechnology companies, government agencies and Wall Street

professionals.  Over the past four decades, *The Cancer Letter* has earned acclaim and numerous

journalism awards for its investigative coverage of issues that shape oncology.  Its work has been

profiled and cited in *The New York Times, The Washington Post, 60 Minutes, 20/20, CNN, NPR,*

*Science, Nature* and many other news outlets, and its coverage has triggered investigations by

Congressional committees, the Institute of Medicine, the Federal Trade Commission, the

Securities and Exchange Commission, and the Department of Justice.  (*See* accompanying

Declaration of Paul B. Goldberg ("Goldberg Decl.") at ¶¶ 2-4.)

On February 16, 2007, *The Cancer Letter* published an article entitled "Danish

Researchers Post Long-Awaited Aranesp Results—Ever So Discreetly," with the jump line,

"Amgen Didn't Tell Wall Street About Results of Danish Study" (the "Article").  The Article

reported on the results of a study ("DAHANCA 10") that was designed, in part, to address safety

issues of the Amgen EPO drug, Aranesp, which was widely used for treating anemia in patients

with chronic kidney disease or undergoing chemotherapy.  (*Id.* at ¶¶ 5-6, 10 and Ex. A.)

The DAHANCA 10 results on which Mr. Goldberg reported in his Article, included the

fact that the study was temporarily halted in October 2006, and two months later, principal

investigator Jens Overgaard posted on the DAHANCA website a notice that the investigators had

decided to end the study entirely because the results showed that some patients had experienced

greater tumor growth on Aranesp and overall survival was no greater than for those not treated

with the drug.  (*Id.* at ¶ 10 and Ex. A.)  The article quoted Roy Barnes, Amgen's vice president

for oncology supportive care, as saying "What's on this Web page is all we know at this point"

and that he could not remember whether Amgen was first informed about the results, however,

3

the company "communicated with the regulatory authorities within 24 hours of getting the information." (*Id.*) The article also quoted two individuals who purportedly had knowledge of the DAHANCA 10 results prior to the Article's publication—Dr. Michael Henke, a German oncologist who said he had "found [the study results] by Google," and Dr. Charles Bennett, an oncologist at Northwestern University, who was reported to have "first learned about the Danish results from a European colleague last week." (*Id.*) The Article also identified Dr. David Steensma, associate professor of medicine and oncology at the Mayo Clinic, who it reported had been guided to the Web document by the reporter of the Article. (*Id.*) The Article further identified additional named sources and quoted their opinions about the study and/or related matters. These named sources included Dr. Howard Ozer (chief of hematology and oncology and Eson chair and professor of medicine at the University of Oklahoma Cancer Center) and Dr. Scott Lippman, chairman thoracic/head and neck medical oncology at M.D. Anderson Cancer Center. (*Id.*)

Following Mr. Goldberg's report of the DAHANCA 10 results, a congressional hearing was held (because Aranesp was widely used in government health care programs) and the FDA added a black box warning (the most serious warning about safety risk) to the Aranesp. (*Id.* at ¶ 7.) In addition to the warning, the FDA required Amgen to engage in additional special proceedings to warn patients about erythropoiesis-stimulating agents ("ESAs"), such as Aranesp, including the development of a risk management program, a *Medication Guide*, and the ESA APPRISE (Assisting Providers and Cancer Patients with Risk Information for the Safe Use of ESAs) Oncology program. (*Id.* at ¶ 8.) The FDA also placed medications including Aranesp into a risk evaluation and mitigation strategy ("REMS"). (*Id.*) The bottom line is that Mr.

4

Goldberg's Article raised a critically important issue regarding the health risk of a marketed pharmaceutical product and thereby likely saved many lives.

On April 17, 2007, Plaintiffs in the underlying litigation filed a class action lawsuit for securities fraud against Amgen, alleging that Amgen engaged in a scheme to deceive the investing public about the true value of Amgen stock. *See In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1019 (C.D. Cal. 2008). More specifically, Plaintiffs allege that Amgen made a series of false and misleading statements regarding its financial performance and the safety of its products, including Aranesp, and that after Mr. Goldberg published the Article at issue, Amgen's stock dropped in value. *Id.* at 1024-26. Plaintiffs contend that Mr. Goldberg's Article is the purported "corrective disclosure" in that securities fraud litigation.

On October 15, 2014 and November 3, 2014, Amgen served on *The Cancer Letter* a subpoena *duces tecum* and then a revised subpoena *duces tecum*, seeking documents regarding first ten and then twelve specified topics, mostly relating to *The Cancer Letter's* sources. (*See* Declaration of Jenny L. Colgate ("Colgate Decl.") at ¶¶ 2-5 and Ex. 1-2.) Counsel for *The Cancer Letter* objected to the subpoena on grounds that the documents sought were protected from disclosure by, *inter alia*, the reporter's privilege. (*See id.* at ¶¶ 6-7 and Ex. 3.) *The Cancer Letter* did agree to provide Amgen with a copy of the Article at issue, as well as a follow-up publication issued on February 23, 2007. (*See id.*) *The Cancer Letter* further responded that to the extent non-privileged documents ever existed that are responsive to the subpoenas and were previously in *The Cancer Letter's* possession, custody or control, such documents were likely amongst those turned it over to the Subcommittee on Oversight and Investigations of the House Committee on Energy and Commerce in 2007. (*See id.*)

Seven months later, on May 12, 2015, Amgen served on Mr. Goldberg a subpoena *ad*

*testificandum*, commanding Mr. Goldberg to appear for deposition on June 17, 2015 to testify

regarding his sources for the Article that Mr. Goldberg wrote more than eight years prior. (*See*

*id.* at ¶¶ 8-9 and Ex. 4 (the "Subpoena").) Counsel for Mr. Goldberg objected to the Subpoena

on the grounds that the testimony sought was protected from disclosure by the reporter's

privilege. (*See id.* at ¶¶ 10-11 and Ex. 5.) When Amgen challenged the applicability of the

reporter's privilege, counsel for Mr. Goldberg asked Amgen to identify the topics of information

sought, why the information was "crucial" to Defendant's case, and what other efforts Amgen

had made to obtain the information from other sources. (*See id.* at ¶¶ 12-13.) Amgen identified

the following information that it said it was seeking for Mr. Goldberg:

> (1) what Mr. Goldberg's sources were for his Article;
>
> (2) how many sources Mr. Goldberg had for his Article;
>
> (3) how Mr. Goldberg learned the information that he reported in his Article; and
>
> (4) with whom Mr. Goldberg shared the information disclosed in his Article, if
>
> anyone, prior to publication.

(*Id.* at ¶ 14.) Amgen admitted that it had not contacted or subpoenaed either of the individuals

disclosed in the Article as having knowledge of the DAHANCA 10 results prior to publication of

the Article. (*Id.* at ¶ 15.) Amgen's counsel explained that Dr. Henke resided in Germany and

that it was therefore easier to get the information it sought from Mr. Goldberg. (*Id.* at ¶ 16.)

Amgen further admitted that of the other individuals referenced in the Article, the only ones

Amgen had sought discovery from were several analysts whose depositions had not yet occurred.

(*Id.* ¶ 17.) Despite the fact that Amgen had depositions with analysts scheduled and upcoming,

Amgen insisted on proceeding with the deposition of Mr. Goldberg and would not agree to

postpone it until after Amgen deposed the individuals identified in the Article. (*Id.* ¶ 18.)

Pursuant to Rules 45 and 26 of the Federal Rules of Civil Procedure, Mr. Goldberg respectfully moves to quash the subpoena *ad testificandum* issued from the Central District of California and served upon him by the Defendant in *In re Amgen Securities Litigation*, No. 07-2536 (C.D. Cal.), on the grounds that the information about which Amgen seeks to depose Mr. Goldberg is protected by the reporter's privilege under the First Amendment of the U.S. Constitution and the federal common law that protects journalists from being compelled to produce information obtained during the course of news gathering.  Alternatively, Mr. Goldberg moves this Court for a protective order, restricting Amgen's access to information regarding Mr. Goldberg's sources.  Mr. Goldberg also requests relief in the form of reasonable attorneys' fees, pursuant to Fed. R. Civ. P. 45(d).

## LEGAL STANDARD

This Court has consistently relied on the Federal Rules of Civil Procedure to quash subpoenas issued to members of the news media.  *See, e.g., Saperstein v. Palestinian Auth. (In re Subpoena to Goldberg)*, 693 F. Supp. 2d 81, 87-88 (D.D.C. 2010) (quashing a subpoena under Rule 26(b)).  Pursuant to Federal Rule of Civil Procedure 45(d)(3)(A)(iii)(iv), the court must quash a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies; or subjects a person to undue burden."  Furthermore, to afford protection to an individual subjected to a subpoena, the court may grant a motion to quash if the subpoena requires "disclosing a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(B)(i).

Similarly, Rule 26(b)(2) requires a court to limit discovery if it finds that the discovery sought is, *inter alia*, "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."  Fed. R. Civ. P. 26(b)(2)(C)(i).  Rule 26 further provides, in section (c), that an individual from whom discovery

7

is sought may seek a protective order from the court and "the court may for good cause, issue an

order to protect a party or person from annoyance, embarrassment, oppression, or undue burden

or expense, including one or more of the following: forbidding the disclosure of discovery;

forbidding inquiry into certain matters or limiting the scope of discovery or discovery to certain

matters." Fed. R. Civ. P. 26(c)(1).

Fed. R. Civ. P. 45(d)(1) provides that the court for the district where compliance is

required must impose sanctions in the form of reasonable attorneys' fees on a party that fails to

take reasonable steps to avoid imposing undue burden or expense on a person subject to a

subpoena.

## ARGUMENT

Amgen seeks to obtain from Mr. Goldberg deposition testimony on the following "non-

exhaustive" list of topics: (1) *who* are Mr. Goldberg's sources; (2) *how many* sources were there;

(3) *how* did those sources communicate with Mr. Goldberg; and (4) *with whom* was the

confidential information shared prior to publication.  (*See* Colgate Decl. at ¶ 14.)  Because all of

these topics relate to Mr. Goldberg's sources, and further because none of these topics concerns

information "crucial" to any claim or defense and because the requested information is available

*via* other discovery means that Amgen has failed to exhaust, this Court should grant Mr.

Goldberg's motion to quash.

## I.
## AMGEN'S SUBPOENA SHOULD BE QUASHED BECAUSE THE TESTIMONY IT SEEKS FROM MR. GOLDBERG IS PROTECTED BY THE REPORTER'S PRIVILEGE

This Court has recognized that the First Amendment affords non-party journalists a

qualified protection against compelled discovery. *See Tripp v. DOD*, 284 F. Supp. 2d 50, 54

(D.D.C. 2003) (granting motion for a protective order against discovery regarding reporter's

sources for the article at issue); *see also Peck v. City of Boston (In re Slack)*, 768 F. Supp. 2d

8

189, 195 (D.D.C. 2011) (granting motion to quash subpoena seeking testimony regarding non-confidential newsgathering information—the size of a restricted area for street performances). The policy behind the reporter's privilege stems from courts' concern about the cumulative effect of subpoenaing the press to be fact-finders in private lawsuits. *See Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. App. 1981) ("Unless potential sources are confident that compelled disclosure is unlikely, they will be reluctant to disclose any confidential information to reporters."); *see also Peck*, 768 F. Supp. 2d at 194 (further explaining that "[i]f a reporter's privilege did not apply to nonconfidential information, it would result 'in a wholesale exposure of press files to litigant scrutiny [and] would burden the press with heavy costs of subpoena compliance...").

When a journalist's testimony or notes are sought, courts must balance the potential harm to the free flow of information that might result against the asserted need for the requested information. *See Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 119 (D.D.C. 2002). The burden is on the party asserting the reporter's privilege to show that it applies in a particular case. *Id.* at 120 n. 4. "Although the reporter bears the burden of demonstrating the applicability of the privilege, in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege." *Tripp*, 284 F. Supp. 2d at 54 (internal citations and quotations omitted). *See also Zerilli*, 656 F.2d at 712 ("[I]f the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished.").[1]

---

[1] In addition to the privilege rooted in the First Amendment, some courts have recognized a federal common law reporter's privilege. *See In Re Grand Jury Subpoena (Miller)*, 397 F.3d 964, 986-87 (D.C. Cir. 2005) (Tatel, J. concurring in judgment) (advocating adoption of a common law reporter's privilege in this Circuit in grand jury context); *Hatfill v. Gonzales*, 505 F. Supp. 2d 33, 44 (D.D.C. 2007). The laws of several states including the District of Columbia as well as federal courts support recognition of a reporter's privilege and to disregard this notion "would not only imperil vital newsgathering, but also shirk the common law function assigned by Rule 501 and 'freeze the law of privilege' contrary to Congress's wishes." *Miller*, 397 F.3d at 995 (Tatel, J.). Under the common law privilege, the Court should consider not only the litigant's need for the information and exhaustion of alternate sources but must also "weigh the public interest in compelling disclosure.... against the public interest in

Here, there is no question that Mr. Goldberg is a reporter and the interest of the subpoenaing party is a private one (a claim under Section 10(b) of the Exchange Act).

## II.
## AMGEN HAS FAILED TO OVERCOME THE REPORTER'S PRIVILEGE

This Court has held that for a journalist to be compelled to testify, the subpoenaing party must overcome the reporter's privilege by satisfying two factors. *See generally Peck*, 768 F. Supp. 2d at 194; *Zerilli*, 656 F.2d at 713; *Hutira*, 211 F. Supp. 2d at 119.  First, the subpoenaing party must "exhaust every reasonable source for" the information from non-journalistic sources. *See Lee v. Department of Justice*, 413 F.3d 53, 59 (D.C. Cir. 2005).  Second, the subpoenaing party must also demonstrate that its need for the information sought is "critical" and goes to "the heart of [the litigant's claim]." *Zerilli*, 656 F.2d at 713.

For the reasons explained below, Defendant in this case has not satisfied either factor.

### A.    Amgen Has Not Exhausted Reasonable Alternative Sources for the Information It Seeks from Mr. Goldberg.

Of critical significance to the current motion, the issuers of subpoenas must first make reasonable efforts through discovery to obtain the information from alternative sources to defeat the privilege.  Courts have routinely held that it is reasonable to require other discovery to take place first – in one case, as many as 60 depositions – before turning to the reporter. *See, e.g., Krase v. Graco Children Prods. (In re Application to Quash Subpoena Nat. Broadcasting Co.)*, 79 F.3d 346, 353 (2d Cir. 1996) (requiring that party seeking journalist's materials exhaust alternatives); *Shoen v. Shoen*, 5 F.3d 1289, 1297 (9th Cir. 1993) (stating exhaustion of alternate sources is nearly implausible early in the discovery process); *In re Petroleum Prods. Antitrust*

---

newsgathering." *Id.* at 998; *see also Lee v. Department of Justice*, 428 F.3d 299, 303 (D.C. Cir. 2005) (Tatel, J. and Garland, J., dissenting from denial of rehearing en banc) ("[I]f the privilege does not prevail in all but most exceptional cases, its value will be substantially diminished.") (quoting *Zerilli*, 656 F.2d at 712). In the instant case, the result under a common law privilege would be the same – the Subpoena should be quashed -- because Mr. Goldberg's testimony is not "crucial" to the case, Amgen has not pursued any alternative sources, and the public interest in protecting the press far outweighs the private interest in compelling disclosure.

*Litig.*, 680 F.2d 5, 8-9 (2d Cir. 1982) (holding that even though 100 witnesses had been deposed, that was not sufficient to establish exhaustion); *Zerilli*, 656 F.2d at 713 (requiring subpoenaing party to show "he has exhausted every reasonable alternative source of information"); *Carey v. Hume*, 492 F.2d 631, 638 (D.C. Cir. 1974) (60 depositions may be appropriate before compelling reporter to testify); *In re McCray*, 928 F. Supp. 2d 748, 758 (S.D.N.Y. 2013) ("Defendants have failed to establish that the information sought is not obtainable elsewhere"); *Application of Behar*, 779 F. Supp. 273, 276 (S.D.N.Y. 1991) (stating alternate sources, including depositions, must first be exhausted before any deposition seeking privileged information would be warranted); *Hutira*, 211 F. Supp. 2d at 122 (failure to exhaust alternative sources weighed "so heavily in favor of quashing the subpoena" that the court declined to consider the remaining analysis).

In glaring contrast to that long line of precedents is the record presented by Amgen on this motion: zero evidence has been identified to show the absence of an alternative source. Here Amgen has admittedly failed to exhaust reasonable alternative sources for the information it seeks from Mr. Goldberg. Indeed, Amgen has done the exact opposite of what the law requires. It has sought testimony and documents from the reporter, Mr. Goldberg, as a <u>first</u> option rather than as a <u>last</u> resort. *See, e.g., Hutira*, 211 F. Supp. 2d at 121-22 (granting motion to quash and concluding that failure to exhaust alternative sources weighed "so heavily in favor of quashing the subpoena" that the court declined to consider whether the information sought was central to litigant's case); *Tripp*, 284 F. Supp. 2d at 61 (entering protective order where the Court was able to identify numerous non-reporter individuals whom the plaintiff could depose for the information it sought); *Peck*, 768 F. Supp. 2d at 197 (quashing subpoena of Boston Globe reporter on grounds that "the plaintiff has provided the court with only general descriptions of

11

his efforts and these descriptions are insufficient to sustain his burden of showing that alternative sources are unavailable").

First, Mr. Goldberg's Article quotes two individuals, Mr. Henke and Mr. Bennett, as having prior knowledge of the DAHANCA 10 results.  Amgen admits that it did not seek deposition testimony or documents from either of these individuals.  (Colgate Decl. at ¶ 15.)  Indeed, when asked whether Defendant tried to subpoena other sources named in the Article, Amgen's counsel responded that Mr. Henke "is in Germany" and "we would have to go under the Hague Convention." (Id. at ¶ 16.)  Amgen's response makes it clear that it is aware that other sources exist for the information it seeks.  Amgen just prefers to get the information from Mr. Goldberg, a reporter, because it is easier than dealing with serving a subpoena under the Hague Convention.

Second, Mr. Goldberg's Article expressly states that the DAHANCA 10 results on which he was reporting were available via Google.  (Goldberg Decl. at ¶ 10, Ex. A (reporting that Henke "found it by Google".)).  Google is a public search engine, accessible to virtually anyone in the world with Internet access.  Because the results were available via Google, it is unclear why it even matters what individuals knew of the results.

Third, Amgen acknowledges that it has upcoming depositions scheduled with analysts regarding the information about which it sought to have Mr. Goldberg testify.  (Colgate Decl. at ¶¶ 17-18.)  When counsel for Mr. Goldberg asked Amgen if it would be willing to cancel Mr. Goldberg's deposition in light of these scheduled depositions and serve a new subpoena if the testimony elicited from the analysts was insufficient for Amgen's purposes, Amgen declined this invitation and insisted on going forward with the deposition of Mr. Goldberg, as noticed.  (Colgate Decl. at ¶ 18.)

Fourth, Mr. Goldberg's Article reports that the DAHANCA 10 results were reported on the DAHANCA website prior to publication of the Article. (Goldberg Decl. at ¶ 10, Ex. A.) Further, Mr. Overgaard posted the information on this website. (*Id.*) Amgen must first seek to obtain the information it seeks from DAHANCA or Mr. Overgaard.

Because there are numerous sources of information available to Amgen, and Amgen has not yet sought documents or deposition testimony from <u>any</u> of them, this Court should grant Mr. Goldberg's motion to quash on that ground alone. *See Zerilli*, 656 F.2d at 713 ("Even when the information is crucial to a litigant's case, reporters should be compelled to disclose their sources only after the litigant has shown that she has exhausted every reasonable alternative source of information.").

### B.      The Testimony Sought from Mr. Goldberg is <u>Not</u> "Crucial."

This Court looks to whether the information sought "is of central importance to the litigant's claim or defense" in determining whether to quash a subpoena. *Hutira*, 211 F. Supp. 2d at 119 (internal quotes omitted).  "If the information sought goes to the heart of the matter, that is, if it is crucial to [the litigant's] case, then the argument in favor of compelled disclosure may be relatively strong." *Id.* This Court has further explained that the information sought must be *important* to the underlying claim, not just "merely marginally relevant" to the case in order to for a subpoenaing party to overcome the reporter's privilege. *See Lee*, 413 F.3d at 57; *see also Peck*, 768 F. Supp. 2d at 194.   This Court frequently held that a source or information may go to the "heart of the matter" if it is essential to establish the elements of the other claim. *See Lee*, 413 F.3d at 60 (plaintiff demonstrated that if he could not show the identities of the leakers, then his ability to establish the other elements of the privacy claim would be compromised); *U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Co., Inc.*, 507 F. Supp. 2d 45, 52 (D.D.C. 2007) ("Information that is a necessary element of proof in a party's claim constitutes critical

13

evidence for which a court will abrogate the reporter's privilege.").

Here, the information Amgen seeks from Mr. Goldberg is not "crucial" to Amgen's claims or defenses in the underlying litigation. Amgen's claims and defenses in the *In re Amgen Securities Litigation* do not rise and fall on establishing who Mr. Goldberg's sources were for his article, how many sources he had, when Mr. Goldberg learned the information, or with whom Mr. Goldberg shared the information. What arguably matters is only whether the information Mr. Goldberg reported was available before Mr. Goldberg reported it. *See Lee*, 413 F.3d at 57 (the information must be important, not just "merely marginally relevant" to the case in order for a subpoenaing party to overcome the reporter's privilege).

Moreover, as explained above, the information Amgen says that it seeks to obtain from Mr. Goldberg—which largely goes to what information was available about the DAHANCA 10 results before Mr. Goldberg published his Article—is cumulative of the information available from numerous other sources, including the Internet/Google. For example, Amgen seeks to compel Mr. Goldberg to testify as to when he learned the information because it is "relevant" (not "crucial") to establish when the DAHANCA 10 results became publicly available. (Colgate Decl. at ¶ 19.) Amgen can establish that from Google records, from DAHANCA's records, or even from the "Wayback Machine" (archive.org). Thus, if Mr. Goldberg were compelled to testify on this topic, his testimony would be "cumulative or duplicative."

Amgen also seeks to compel Mr. Goldberg to testify as to with whom he shared the information, because it is "relevant" (again, not "crucial") to demonstrate the extent of the dissemination of the information prior to the article. (*Id.* at ¶ 20.) However, because the information was already on Google, it was widely available. Thus, if Mr. Goldberg were compelled to testify on this topic, his testimony would be "cumulative or duplicative." *See In Re*

14

*Subpoena to Goldberg*, 693 F. Supp. 2d at 86-87 (granting motion to quash where the defendant sought to depose a *New Yorker* journalist to "elicit evidence of bias in the form of statements made by the Plaintiff and his wife" on grounds that the subpoena, if compelled, would "only produce evidence that is unreasonably cumulative or duplicative," and that disclosure from the journalist "about that bias will have little importance").

Because the information Amgen seeks from Mr. Goldberg is not "crucial" and is cumulative or duplicative of the information already available to Amgen, this Court should grant Mr. Goldberg's motion to quash.

### III.
### ALTERNATIVELY, THIS COURT SHOULD ENTER A PROTECTIVE ORDER PRECLUDING AMGEN FROM INQUIRING INTO MR. GOLDBERG'S SOURCES

Should Mr. Goldberg's motion to quash be denied, this Court should at minimum enter a protective order limiting the scope of Mr. Goldberg's deposition so as to prohibit Amgen from inquiring into Mr. Goldberg's sources and other protected matters.  Rule 26(c)(1) authorizes the Court to enter protective orders "forbidding the disclosure or discovery; and forbidding inquiry into certain matters or limiting the scope of disclosure or discovery to certain matters." Fed. R. Civ. P. 26(c)(1)(A)(D); *see also* Fed. R. Civ. P. 45(d)(3) (authorizing a court to "quash or *modify* a subpoena")(emphasis added).  A protective order is required to safeguard the reporter's privilege enjoyed by Mr. Goldberg and to prevent Amgen from seeking improper discovery from Mr. Goldberg.

### IV.
### ATTORNEYS' FEES

Mr. Goldberg is entitled to recovery of his attorneys' fees in connection with responding to the subpoenas and filing this motion.  Under Fed. R. Civ. P. 45(d)(1): "[a] party or attorney responsible for issuing or serving a subpoena must take reasonable steps to avoid imposing

undue burden or expense on a person subject to the subpoena." This is a compulsory and mandatory requirement on the issuer of the subpoena. Here, Amgen should have sought documents or testimony from Mr. Goldberg only after all alternative sources had been exhausted. Amgen did not do this—instead, turning to Mr. Goldberg <u>first</u> for information.

When this duty has been violated, Rule 45(d) provides: "the court for the district where compliance is required must enforce this duty and impose an appropriate sanction – which may include lost earnings and reasonable attorneys' fees – on a party or attorney who fails to comply." *Id.* Rule 45(d) provides a very specific deterrent to the behavior the Rule 45(d) seeks to prevent. That deterrent is the award of attorneys' fees. Mr. Goldberg asks that the mandate set forth in Rule 45 be applied here and that he be awarded his attorneys' fees in connection with responding to the two subpoenas served by Amgen and the filing and briefing of this motion. *See* Fed. R. Civ. P. 45(d)(1).

## <u>CONCLUSION</u>

For the foregoing reasons, non-party Mr. Goldberg respectfully requests that this Court grant this motion to quash the subpoena *ad testificandum* served on him by Amgen.

Dated: June 25, 2015

Respectfully Submitted,

Steven Lieberman
Jenny L. Colgate
ROTHWELL, FIGG, ERNST & MANBECK, PC
607 14th Street, N.W., Suite 800
Washington, D.C.  20005
(202) 783-6040

*Attorneys for Non-Party Movant*
*Paul B. Goldberg*

16