# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE SUBPOENA TO PAUL B. GOLDBERG<br><br>Amgen Inc.<br>One Amgen Center Drive<br>Thousand Oaks, California 91320-1799 | **MISC. CASE NO. 1:15-mc-00825-APM** |
| IN RE AMGEN INC. SECURITIES LITIGATION | **C.A. NO. CV 07-2536 PSG (PLAx)** |

**DEFENDANT AMGEN INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO NON-PARTY PAUL B. GOLDBERG'S MOTION TO QUASH SUBPOENA AND/OR FOR A PROTECTIVE ORDER, AND FOR ATTORNEY'S FEES**

5012848

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.    **INTRODUCTION**.................................................................................................1

II.    **FACTUAL BACKGROUND**................................................................................4

    A.    **Mr. Goldberg and the Article Are Central to the Securities Litigation** ........4

        1.    *Connecticut alleges Amgen committed securities fraud by failing to disclose the DAHANCA 10 termination*...................................................4

        2.    *Mr. Goldberg's publication of the Article regarding the DAHANCA 10 termination in* The Cancer Letter *is an alleged corrective disclosure* ............................................................................5

    B.    **Amgen Seeks Relevant, Non-Privileged Information from Mr. Goldberg and Others Regarding the Dissemination of News Concerning the DAHANCA 10 Termination** ................................................6

III.    **LEGAL STANDARD** .........................................................................................8

IV.    **ARGUMENT** ......................................................................................................9

    A.    **Mr. Goldberg Has Failed to Demonstrate that the Reporter's Privilege Is Applicable to the Information Amgen Seeks**.............................10

    B.    **Even Assuming the Reporter's Privilege Applies, Amgen Meets Its Burden to Overcome the Privilege** .................................................................12

        1.    *The information Amgen seeks goes to the "heart of the matter"* ...........13

        2.    *Amgen has exhausted reasonable alternative sources of information*.................................................................................................15

        3.    *Mr. Goldberg's testimony is not cumulative or duplicative* ..................18

        4.    *The policy behind the reporter's privilege is not implicated by the information Amgen seeks from Mr. Goldberg*.............................19

    C.    **Mr. Goldberg's Request for Attorneys' Fees Is without Merit** ...................19

V.    **CONCLUSION** .................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Application of Behar*,
    779 F. Supp. 273 (S.D.N.Y. 1991)................................................................................... 16

*Baker v. F&F Inv.*,
    470 F.2d 778 (2d Cir. 1972)........................................................................................... 17

*Blumenthal v. Drudge*,
    186 F.R.D. 236 (D.D.C. 1999)......................................................................................... 9

*Carey v. Hume*,
    492 F.2d 631 (D.C. Cir. 1974)...................................................................................... 17

*Estate of Klieman v. Palestinian Auth.*,
    293 F.R.D. 235 (D.D.C. 2013)*................................................................................ 3, 9, 12

*Gonzales v. NBC, Inc.*,
    194 F.3d 29 (2d Cir. 1998)............................................................................................ 9

*Hutira v. Islamic Republic of Iran*,
    211 F. Supp. 2d 115 (D.D. C. 2002) ...................................................................... 13, 16

*In re Amgen Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...................................................................... 19

*In re Application to Quash Subpoena to Nat'l Broad. Co.*,
    79 F.3d 346 (2d Cir. 1996)......................................................................................... 16

*In re Application of Waldholz*,
    No. 87 CIV. 4296 KMW, 1996 WL 389261 (S.D.N.Y. July 11, 1996) ........................ 15

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ...................................................................................... 13

*In re Grand Jury Subpoena* (*Miller*),
    397 F.3d 964 (D.C. Cir. 2005)....................................................................................... 8

*In re McCray*,
    928 F. Supp. 2d 748 (S.D.N.Y. 2013)......................................................................... 16

*In re Petroleum Prods. Antitrust Litig.*,
    680 F.2d 5 (2d Cir. 1982) .......................................................................................... 16

*In re Slack*,
    768 F. Supp. 2d 189 (D.D.C. 2011) ........................................................................... 12

5012848

*In re Subpoena to Goldberg*,
   693 F. Supp. 2d 81 (D.D.C. 2010) ................................................................. 8

*Lee v. Dep't of Justice*,
   401 F. Supp. 2d 123 (D.D.C. 2005)* ....................................................... 8, 18

*Lee v. Dept. of Justice*,
   287 F. Supp. 2d 15 (D.D.C. 2003) ............................................................. 18

*Maughan v. NL Indus.*,
   524 F. Supp. 93 (D.D.C. 1981) ................................................................... 11

*Metzler Inv. GMBH v. Corinthian Colls. Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .................................................................... 13

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .................................................................. 14

*NLRB v. Mortensen*,
   701 F. Supp. 244 (D.D.C. 1988)* ........................................................... 9, 11

*Padnes v. Scios Nova*,
   No. C 95-1693, 1996 WL 539711 (N.D. Cal. Sept. 18, 1996)* ..................... 13

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) .................................................................... 13

*Rendon Grp., Inc. v. Rigsby*,
   No. 1:10-mc-00164, 2010 WL 4627647 (D.D.C. Nov. 8, 2010).................... 20

*Reporter's Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*,
   593 F.2d 1030 (D.C. Cir. 1978) .................................................................. 10

*Richardson v. Sugg*,
   220 F.R.D. 343 (E.D. Ark. 2004) ................................................................ 11

*SEC v. Seahawk Deep Ocean Tech. Inc.*,
   166 F.R.D. 268 (D. Conn. 1996)* ....................................................... 9, 12, 15

*Shoen v. Shoen*,
   5 F.3d 1289 (9th Cir. 1993) ....................................................................... 16

*Solargen Elec. Motor Car. Corp. v. Am. Motors Corp.*,
   506 F. Supp. 546 (N.D.N.Y. 1981) ............................................................. 11

*White v. H&R Block, Inc.*,
   No 02 Civ. 8965 (MBM), 2004 WL 1698628 (S.D.N.Y. July 28, 2004) ....... 13

5012848

*Zerilli v. Smith,*
   656 F.2d 705 (D.C. Cir. 1981) ................................................................................ 9, 16

## **Other Authority**

U.S. CONST. amend I ..................................................................................................... 8, 10

FED. R. CIV. PRO. 45(d)(1) ............................................................................................. 20

FED. R. EVID. 801 ......................................................................................................... 12

I.      **INTRODUCTION**

Amgen is a pioneering biopharmaceutical company and the developer of Aranesp® and EPOGEN®, erythropoiesis stimulating agents ("ESAs").  Amgen's ESAs have been FDA-approved and used safely and effectively by millions of patients suffering from, among other illnesses, chronic renal failure ("CRF") and chemotherapy-induced anemia ("CIA") for more than a decade.

Despite Aranesp's® and EPOGEN's® well-established safety record and the FDA's approval, Amgen and four of its former officers are accused in a shareholder class-action lawsuit of misleading investors when it stated publicly that its ESAs were safe when used for their FDA-approved indications (the "Securities Litigation").  *In re Amgen Inc. Sec. Litig.*, Case No. 07-cv-2536 PSG (PLAx) (C.D. Cal.).  The lead plaintiff in this lawsuit, Connecticut Retirement Plans and Trust Funds ("Connecticut"), alleges that Amgen shareholders suffered losses when the "truth" about ESA safety was revealed on three dates in 2007, causing Amgen's stock price to fall.

February 16, 2007 is one of those three dates critical to Connecticut's claims.  On that date, Paul Goldberg published an article in *The Cancer Letter* (the "Article") concerning the termination of a clinical study known as DAHANCA 10.  DAHANCA 10 was a study of Aranesp® conducted in Denmark by the Danish Head and Neck Cancer Group ("DAHANCA"); the study was an independent investigator study that was neither conducted nor controlled by Amgen.  On December 1, 2006, more than two months before the Article was published, DAHANCA had terminated the study and disclosed the termination on its website.  Connecticut nevertheless alleges that Mr. Goldberg's February 16, 2007 Article was the first time Amgen investors were informed of the DAHANCA 10 termination.  Connecticut further alleges that the

- 1 -

termination was evidence that ESAs are not safe, and that the Article's disclosure about the termination caused Amgen's stock price to fall on the day that the Article was published.  (*See, e.g.*, Corrected Sec. Am. Compl. ¶¶ 8, 19, 243, *In re Amgen Inc. Sec. Litig.*, No. 07-cv-2536 PSG (PLAx) (C.D. Cal.) (hereinafter the "CSAC").)

The Article is therefore one of three "corrective disclosures" at the heart of Connecticut's claim that Amgen investors suffered losses when the "truth" about ESA safety was revealed.  In other words, Connecticut claims that the Article revealed, and therefore "corrected," Amgen's alleged failure to disclose the DAHANCA 10 termination, and that corrective disclosure caused Amgen investors to suffer losses.  To prove its claim concerning DAHANCA 10, Connecticut must show that the Article was the first time that investors learned of DAHANCA 10's termination.  One of the ways Amgen can defend against Connecticut's claim is to show that investors or other stock market participants learned of the DAHANCA 10 termination before the Article was published on February 16, 2007.

Because Mr. Goldberg is the author of the Article, he is uniquely positioned to provide admissible testimony critical to Amgen's defense concerning the disclosure of the DAHANCA 10 termination to market participants.  Although he is a reporter, Amgen is entitled to take Mr. Goldberg's deposition to support its defense to the claims concerning DAHANCA 10 for two independent reasons.

*First*, Mr. Goldberg has failed to establish any reason the so-called "reporter's privilege" should apply to the testimony Amgen seeks.  The reporter's privilege is a qualified privilege – it is not the blanket, absolute protection that Mr. Goldberg has claimed.  Moreover, Amgen does not seek at this time the identities of privileged sources or any privileged materials or notes.

Amgen seeks only non-privileged information, and Amgen is entitled to take Mr. Goldberg's testimony to develop this admissible evidence for its defense and use at trial.

*Second*, even assuming that the reporter's privilege applies, Amgen meets its burden to compel Mr. Goldberg to testify by showing that (1) the information sought goes to the "heart of the matter" and (2) Amgen has exhausted reasonable alternative sources. *See Estate of Klieman v. Palestinian Auth.*, 293 F.R.D. 235, 241 (D.D.C. 2013).   Contrary to Connecticut's central claim that market participants first learned of the DAHANCA 10 termination when Mr. Goldberg published the Article, his Article suggests that investors or other market participants were, in fact, aware of the DAHANCA 10 termination before the Article was published.  For example, Mr. Goldberg refers in the Article to "[o]bservers in oncology and on Wall Street" and "[s]everal Wall Street sources" to whom he earlier disclosed the DAHANCA 10 termination.  (*See* Goldberg Decl., Ex. A at 2.)

Connecticut may argue at trial that the Article's assertions are inadmissible hearsay. Mr. Goldberg, however, can provide admissible testimony critical to Amgen's defense by establishing, for example, the fact that he disclosed the DAHANCA 10 termination to market participants before the Article was published.  Amgen is thus seeking Mr. Goldberg's testimony because it is at the heart of Amgen's defense that the Article was *not* the first time that at least some market participants learned of the DAHANCA 10 termination.  Further, because the Article does not identify the "observers on Wall Street" whom Mr. Goldberg informed of the DAHANCA 10 termination, he is the only known witness Amgen can depose about this.  And, contrary to Mr. Goldberg's representations, Amgen has exhausted reasonable alternative sources by engaging in other attempted discovery concerning the disclosure of the DAHANCA 10 termination.

For these and the reasons described further below, Mr. Goldberg's Motion should be denied, and the Court should order Mr. Goldberg to appear for a deposition pursuant to Amgen's subpoena.[1]

## II.    FACTUAL BACKGROUND

### A.    Mr. Goldberg and the Article Are Central to the Securities Litigation

1.    *Connecticut alleges Amgen committed securities fraud by failing to disclose the DAHANCA 10 termination*

Amgen is the defendant in a shareholder class action in the Central District of California against it and four of its former officers (collectively, "Defendants") under Sections 10 and 20(a) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.  The gravamen of Connecticut's allegations is that Defendants misled investors concerning the safety of Aranesp® and EPOGEN®.  In simple terms, these drugs stimulate the body to create more red blood cells, thereby increasing hemoglobin levels in CRF and CIA patients.

Among other things, Connecticut alleges that Amgen did not timely disclose to investors that one clinical trial concerning Aranesp®, the DAHANCA 10 study, was terminated in December 2006.  Amgen did not design, oversee, or conduct the study.  Instead, DAHANCA 10 was an independent investigator study conducted in Denmark by DAHANCA.  DAHANCA designed the study to evaluate a potential off-label use of Aranesp®; namely, whether Aranesp® could improve the effect of primary curative radiotherapy in patients with head and neck cancer. The study tested the hypothesis that maintaining a patient's hemoglobin levels higher than the normal range would allow improved oxygenation of the tumor, making it more sensitive to

---

[1] Pursuant to Local Rule 7(f), Amgen respectfully requests an oral hearing at the discretion of the Court.

radiotherapy.  It targeted hemoglobin levels well above the Aranesp® label and inconsistent with clinicians' use of the drug.

On or about December 1, 2006, DAHANCA terminated the study and reported on its website that the "likelihood of a reverse outcome, i.e., that Aranesp® would be significantly better than in control was almost non-existing . . . .  It was therefore decided that the trial should be terminated and further inclusion stopped."  (Dixon Decl., Ex. 1 at 2.)  In other words, DAHANCA terminated the study because it determined that the study was unlikely to prove its hypothesis that Aranesp® improved primary curative radiotherapy.

Amgen immediately informed the FDA and regulatory agencies around the world of the termination.  (*Id.* ¶ 3.)  Amgen did not, however, make any public announcements about the DAHANCA 10 termination.  DAHANCA had reported the termination of the study on its website.  Moreover, Amgen had not been provided with the underlying data DAHANCA used to reach its decision to terminate the study and knew nothing at the time about the termination other than the information DAHANCA had reported on its website.  Nevertheless, Connecticut asserts that Amgen's failure to make an independent disclosure to investors of the DAHANCA 10 termination constituted securities fraud.  (*See, e.g.*, CSAC ¶¶ 93-105.)

2.     *Mr. Goldberg's publication of the Article regarding the DAHANCA 10 termination in* The Cancer Letter *is an alleged corrective disclosure*

On February 16, 2007, *The Cancer Letter* published Mr. Goldberg's article entitled, "Danish Researchers Post Long-Awaited Aranesp Results—Ever So Discreetly."  (Goldberg Decl., Ex. A.)  The Article reported on the DAHANCA 10 termination.  According to Connecticut, the Article partially revealed Amgen's alleged securities fraud and caused Amgen's stock price to fall.  (CSAC ¶ 243.)  Specifically, Connecticut alleges that this disclosure partially

corrected Amgen's alleged failure to independently inform investors that DAHANCA 10 had been terminated in December 2006.  (*Id.* ¶¶ 99-104, 243.)

In the Article, Mr. Goldberg reported that "even informed observers have been largely unaware that the Danish study was temporarily stopped on Oct. 18, 2006, and that the decision not to resume the study was made on Dec. 1, 2006, and posted on the Web [by DAHANCA]." (Goldberg Decl., Ex. A. at 1-2.)  He further reported that "[s]everal Wall Street sources who monitor Amgen confirmed that they have been awaiting these results and were not aware of them until hearing about the closing of the trial from [Mr. Goldberg]."  (*Id.* at 2.)  Based at least in part on these reports, Connecticut has maintained in the Securities Litigation that news of the DAHANCA 10 termination was not known to investors prior to the Article's publication. (CSAC ¶ 243.)  Mr. Goldberg, however, now contends in his Motion that the news about the DAHANCA 10 termination was "widely available."  (Mot. at 14.)

B.    **Amgen Seeks Relevant, Non-Privileged Information from Mr. Goldberg and Others Regarding the Dissemination of News Concerning the DAHANCA 10 Termination**

Because the Article forms the basis for one of Connecticut's claims against Defendants, Amgen has already attempted other avenues of discovery regarding the public availability of the DAHANCA 10 termination.  On October 15, 2014, Amgen issued document subpoenas to four of Mr. Goldberg's named sources in the Article who are located in the US, seeking documents concerning their communications with Mr. Goldberg or *The Cancer Letter*.[2]  (Dixon Decl. ¶¶ 5-9 and Exs. 2-5.)  Amgen also issued a document subpoena to *The Cancer Letter* the same day.

---

[2] The Article does not identify any of the "informed observers" or "Wall Street sources" referred to in the Article.  It does identify and quote five other individuals:  Dr. Michael Henke, an oncologist located in Germany; Dr. David Steensma, an oncologist with the Mayo Clinic; Dr. Charles Bennett, an oncologist at Northwestern University; Dr. Scott Lippman, an oncologist with MD Anderson Cancer Center; and Dr. Howard Ozer, an oncologist at the University of Oklahoma Cancer Center.  (Goldberg Decl., Ex. A at 2-4.)

(Colgate Decl., Ex. 1.)  After correspondence with one of the named sources, Dr. Scott Lippman, who told Amgen that any responsive documents would be in the possession of his former employer, MD Anderson Cancer Center ("MD Anderson"), Amgen issued a document subpoena to MD Anderson a few days later.  (Dixon Decl. ¶ 10 and Ex. 6.)  Amgen then issued an amended document subpoena to *The Cancer Letter*.  (Colgate Decl., Ex. 2.)

On November 14, 2014, *The Cancer Letter* objected to Amgen's document subpoena and, other than providing a copy of the Article and an additional article from February 20, 2007, claimed that it had no responsive documents.  (Colgate Decl., Ex. 3.)  Soon thereafter, MD Anderson informed Amgen that it had no documents responsive to its request.  (Dixon Decl. ¶ 13 and Ex. 7.)  Amgen conducted follow-up correspondence with the remaining subpoenaed sources, but was unable to obtain any responsive documents other than a copy of Article.  (*Id.* ¶¶ 11-14.)

Amgen has also conducted its own due diligence to determine the availability of news about the DAHANCA 10 termination by reviewing securities analyst reports, news reports in both the United States and Europe, and regulatory publications from US and European regulators.  (*Id.* ¶ 15.)

On May 12, 2015, Amgen served a subpoena *ad testificandum* on Mr. Goldberg, scheduling his deposition for June 17 in Washington, D.C.  (Colgate Decl., Ex. 4.)  Although Amgen repeatedly told Mr. Goldberg's counsel that Amgen was willing to work with Mr. Goldberg to identify a mutually convenient date and location for Mr. Goldberg's deposition, as well as to limit the topics of Mr. Goldberg's deposition, Mr. Goldberg refused to sit for his deposition.  (Dixon Decl. ¶¶ 16-20.)  Instead, Mr. Goldberg asserted that the reporter's privilege

provided him with complete and absolute protection from testifying regarding any subject matter concerning the Article or DAHANCA 10.[3]  (*Id.*)

In letters, Mr. Goldberg's counsel stated that (1) Mr. Goldberg could not recall when he first became aware of the DAHANCA 10 termination and (2) the only two people with whom Mr. Goldberg spoke before publishing the Article who were aware of the DAHANCA 10 termination were Dr. Michael Henke and Dr. Charles Bennett.  (Colgate Decl., Exs. 5C, 6A.)  As Amgen informed Mr. Goldberg's counsel, however, his representations are not admissible evidence at trial.  (*Id.*, Exs. 5D, 6C.)  Moreover, Mr. Goldberg has not supplied any other non-privileged evidence Amgen seeks to support its defense, such as when or how many "Wall Street sources" Mr. Goldberg consulted with prior to publication of the Article or the identity of his non-confidential sources, if any.

## III.   LEGAL STANDARD

As Mr. Goldberg now concedes, the reporter's privilege under the First Amendment is a *qualified* privilege.[4]  (Mot. at 8 ("This Court has recognized that the First Amendment affords non-party journalists a *qualified* protection against compelled discovery." (citation omitted) (emphasis added)); *see also Lee v. Dep't of Justice*, 401 F. Supp. 2d 123, 131 (D.D.C. 2005).

---

[3] Amgen specifically told Mr. Goldberg that it was *not* seeking the identities of confidential sources, to the extent they exist, or the production of unpublished documents.  (Colgate Decl., Ex. 5B.)  Instead, Amgen told Mr. Goldberg that its interest was in his non-privileged knowledge concerning DAHANCA 10 and the Article that form the basis for Connecticut's allegations that the Article was a corrective disclosure.  (*See id.*)

[4] Relegated to a footnote, Mr. Goldberg states that "some courts have recognized a federal common law reporter's privilege," relying on Judge Tatel's concurrence in *In re Grand Jury Subpoena* (*Miller*), 397 F.3d 964, 986-987 (D.C. Cir. 2005) (Tatel, J., concurring).  (*See* Mot. at 9 n.1.)  That is not, however, the law in the D.C. Circuit, as there is no federal common law reporter's privilege in this Circuit.  *See In re Subpoena to Goldberg*, 693 F. Supp. 2d 81, 88 (D.D.C. 2010) ("That Goldberg chose to discuss the existence of a common law reporter's privilege in a footnote is telling in that the authority cited for such a privilege is Judge Tatel's concurrence . . . .  Concurrences, however, are not binding authority and have no precedential effect.").

The policy behind the qualified reporter's privilege is to protect the press from becoming surrogate fact-finders, where parties involved in litigation "sift through press files in search of information supporting their claims."  (Mot. at 2 (quoting *Gonzales v. NBC, Inc.*, 194 F.3d 29, 35 (2d Cir. 1998)).)   That policy is diminished, however, where the reporter has unique information or is an actual source of relevant information.  *See NLRB v. Mortensen*, 701 F. Supp. 244, 248 (D.D.C. 1988) ("But where the journalist appears to be the only one with access to information relevant to the case, courts are willing to compel disclosure."); *SEC v. Seahawk Deep Ocean Tech., Inc.*, 166 F.R.D. 268, 271 (D. Conn. 1996) (noting that "several factors [] diminish the weight to be accorded to the qualified privilege," including whether the "testimony sought is not of a confidential nature" and where the "reporter himself is subpoenaed").

The party opposing discovery, here Mr. Goldberg, has the burden of showing that the privilege applies to the facts of this litigation.  *Estate of Klieman*, 293 F.R.D. at 241.  Once the party invoking the privilege demonstrates its applicability, the burden shifts to the party seeking information to show that on "the specific facts of the case," its interest outweighs the public interest in protecting the journalist's sources and information.  *Id.* (quoting *Blumenthal v. Drudge*, 186 F.R.D. 236, 244 (D.D.C. 1999)).  When balancing these competing interests in the civil context, the Court must consider whether (1) the information sought "goes to the heart of the matter" and (2) the party seeking the information has "exhausted reasonable alternative sources of information."  *Id.* (citing *Zerilli v. Smith*, 656 F.2d 705, 713-14 (D.C. Cir. 1981)).

## IV.   <u>ARGUMENT</u>

To present evidence rebutting Connecticut's allegation that Mr. Goldberg's Article was a corrective disclosure, Amgen seeks to obtain deposition testimony from Mr. Goldberg concerning (1) when he learned about the DAHANCA 10 termination, (2) any non-privileged

sources from whom he learned about the termination, (3) when and how many people Mr. Goldberg discussed the DAHANCA 10 termination with prior to publication of the Article, including how many securities analysts, "Wall Street sources," or other market participants, (4) whether anyone Mr. Goldberg spoke with prior to publication of the Article was aware of the DAHANCA 10 termination, and (5) the bases for his belief that the termination was "widely available," (Mot. at 14).  Amgen also seeks to verify certain representations and statements in Mr. Goldberg's Article in advance of trial.

This information is discoverable for at least two reasons.  *First*, it is not subject to the reporter's privilege because it is non-privileged information.  Amgen does not seek the disclosure of any of Mr. Goldberg's privileged sources or the disclosure of any privileged notes or written work product.  *Second*, even if this information is privileged, Amgen meets its burden to compel testimony because (1) the information Amgen seeks goes to the "heart of the matter" and (2) Amgen has exhausted reasonable alternative sources.

A.  **Mr. Goldberg Has Failed to Demonstrate that the Reporter's Privilege Is Applicable to the Information Amgen Seeks**

Mr. Goldberg summarily claims: "there is no question that Mr. Goldberg is a reporter and the interest of the subpoenaing party is a private one."  (Mot. at 10.)  Therefore, according to Mr. Goldberg, he is absolutely privileged from testifying regarding any conceivable subject – even non-privileged information.  (*See id.*)  That is not the law, and Mr. Goldberg fails to provide any authority for his broad interpretation of the reporter's privilege.  To the contrary, "[t]he First Amendment does not guarantee plaintiff 'journalists,' or other citizens, a special right to immunize themselves from good faith investigation simply because they may be engaged in gathering information."  *Reporter's Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1051 (D.C. Cir. 1978).

5012848

Amgen seeks non-privileged information concerning, among other things, (1) how and when Mr. Goldberg learned of the DAHANCA 10 termination and (2) when Mr. Goldberg spoke with those sources cited in the Article. This is not privileged information; Amgen is not seeking the disclosure of any confidential notes or sources, but is instead interested in the timing of any of Mr. Goldberg's communications with "Wall street sources" and his own personal belief as to the "wide[] availab[ility]," (Mot. at 14), of the DAHANCA 10 termination. Mr. Goldberg is not immunized from testifying simply because he is a reporter.[5]

Amgen also seeks to confirm the accuracy of the Article in preparation for trial. This Court has held such verification permissible and outside the scope of the reporter's privilege. *See NLRB v. Mortensen*, 701 F. Supp. 244, 250 (D.D.C. 1988) ("The reporters' interests in refusing to testify for the sole purpose of verifying the statements, not disclosing sources, is rather attenuated and must yield to the need for confirmation as presented here."). Amgen may ask "simple questions as to matters evident on the face of the article," such as whether Dr. Henke and Dr. Bennett did in fact tell Mr. Goldberg they were aware of the termination prior to being contacted by Mr. Goldberg, and whether Mr. Goldberg became aware of the DAHANCA 10 termination because it was "posted on the Web," as he stated in his Article. *See Maughan v. NL Indus.*, 524 F. Supp. 93, 95 (D.D.C. 1981) (quashing document subpoena where reporter was also subpoenaed to testify, stating that it would be permissible to ask reporter questions such as "whether [the] article was truly published on the date asserted and whether he did in fact interview [plaintiffs] before writing the article").

---

[5] Further, "[t]he appropriate way for a reporter to respond to [a] subpoena commanding him to appear at a deposition is to appear for the deposition and assert his privileges in response to specific questions . . . ." *Richardson v. Sugg*, 220 F.R.D. 343, 347 (E.D. Ark. 2004); *see also Solargen Elec. Motor Car. Corp. v. Am. Motors Corp.*, 506 F. Supp. 546, 552 (N.D.N.Y. 1981) (denying motion to quash and holding that reporters "must instead respond to the subpoenas and assert whatever privilege they may properly invoke in response to particular questions").

5012848

In fact, Mr. Goldberg confirmed via letter that at least two of his named sources –

Dr. Michael Henke and Dr. Charles Bennett – told him that they were aware of the DAHANCA

10 termination prior to Mr. Goldberg contacting them.  (Colgate Decl., Ex. 6A).  This is

precisely the information that Amgen needs to establish on the record to rebut Connecticut's

allegations that the Article was the first public disclosure of the DAHANCA 10 termination.

Although Amgen appreciates Mr. Goldberg's representations via letter, they are not admissible at

trial.  *See* FED. R. EVID. 801.  A deposition of Mr. Goldberg remains the only available means of

obtaining admissible testimony on this issue.[6]  *See Seahawk Deep Ocean Tech., Inc.*, 166 F.R.D.

at 271 (requiring journalist to testify where SEC did "not seek any documents at all, but simply

seeks the movant's testimony to confirm the accuracy of his story . . . .").

Accordingly, Mr. Goldberg has failed to demonstrate that the reporter's privilege applies

to the specific information Amgen seeks.

**B.     Even Assuming the Reporter's Privilege Applies, Amgen Meets Its Burden to Overcome the Privilege**

Even assuming the information Amgen seeks from Mr. Goldberg is protected by the

reporter's privilege, "the showing needed to overcome a reporter's privilege when the

information sought is non-confidential is 'less demanding than the showing required where

confidential materials are sought.'"  *Estate of Klieman*, 293 F.R.D. at 242 (quoting *In re Slack*,

768 F. Supp. 2d 189, 194 (D.D.C. 2011)).  To meet its burden, Amgen must show that the

information sought goes to the "heart of the matter" and that Amgen has exhausted *reasonable*

alternative sources of information.  *See id.* at 241.  Amgen meets this burden.

---

[6] Mr. Goldberg's willingness to disclose to Amgen that Drs. Henke and Bennett were aware of the termination prior to publication of the Article suggests that even Mr. Goldberg does not believe this information is privileged.

1.     *The information Amgen seeks goes to the "heart of the matter"*

As Mr. Goldberg states, information goes to the "heart of the matter" where it is "of central importance to the litigant's claim or defense." (Mot. at 13 (citing *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 119 (D.D. C. 2002)).)  A central allegation in the Securities Litigation is that Mr. Goldberg's Article was a corrective disclosure that publicly revealed the DAHANCA 10 termination for the first time and caused investor losses.  (*See, e.g.*, CSAC ¶¶ 8, 19, 243.)

Information about when and how the DAHANCA 10 termination was communicated by or to Mr. Goldberg is of central importance to Amgen's defense that Connecticut cannot prove the loss causation element of its claim concerning the DAHANCA 10 study.  Under federal securities laws, the loss causation element requires a plaintiff to prove that a materially fraudulent statement or omission was later revealed to the market and that disclosure caused the plaintiff's losses.  *Metzler Inv. GMBH v. Corinthian Colls. Inc.*, 540 F.3d 1049, 1062-63 (9th Cir. 2008).  But if the information allegedly concealed from the market was already publicly known before the alleged corrective disclosure, a plaintiff cannot establish loss causation.[7]  *See*

---

[7] Similarly, a plaintiff cannot prove a material omission if the allegedly omitted information was publicly known at or about the time of the alleged omission. *See Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996) ("[I]f the market has become aware of the allegedly concealed information, 'the facts allegedly omitted by the defendant would already be reflected in the stock's price' and the market 'will not be misled.'" (quoting *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991))).  The information Amgen seeks from Mr. Goldberg is thus also of central importance to this separate defense because evidence that at least some analysts or other market participants were aware of the DAHANCA 10 termination at the time can be used to show that Amgen should not be held liable for a material omission. *See White v. H&R Block, Inc.*, No 02 Civ. 8965 (MBM), 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004) (dismissing certain alleged misstatements based on truth-on-the-market defense because the "truth was available in the market with more intensity and credibility than was any purported misstatement from defendants"); *Padnes v. Scios Nova Inc.*, No. C 95-1693, 1996 WL 539711, at *7-8 (N.D. Cal. Sept. 18, 1996) (dismissing complaint based on truth-on-the-market defense where analysts were aware of published clinical trial data). *Padnes* is particularly instructive.  There, plaintiffs alleged that defendants misled the market concerning the results of a clinical study, despite the study results

*id.*; *see also Meyer v. Greene*, 710 F.3d 1189, 1197-98 (11th Cir. 2013) (a disclosure "must present facts to the market that are new, that is, publicly revealed for the first time").

Here, Mr. Goldberg wrote in the Article that he discussed with "[s]everal Wall Street sources" the DAHANCA 10 termination prior to publication of the Article. (Goldberg Decl., Ex. A at 2.). Further, during the meet-and-confer process, Mr. Goldberg's counsel affirmatively suggested that Mr. Goldberg may have shared information with securities analysts concerning DAHANCA 10 prior to publication. (Dixon Decl. ¶ 20.) But Mr. Goldberg's counsel claimed that Amgen was not entitled to learn about the timing of those communications because those analysts "could have been a source." (*Id.*) It is critical to Amgen's defense to Connecticut's loss causation theory to obtain admissible testimony from Mr. Goldberg to show that market participants were, in fact, aware of the news about the DAHANCA 10 termination before the Article was published. Notably, Mr. Goldberg cites no authority for the proposition that the *timing* of his communications – even with confidential sources – is privileged.

Moreover, in his Motion, Mr. Goldberg contends that information about the DAHANCA 10 termination was "widely available." (Mot. at 14.) This is directly contrary to Connecticut's loss causation theory. Thus, admissible testimony from Mr. Goldberg – the mouthpiece of Connecticut's corrective disclosure and the author who allegedly broke the news concerning DAHANCA 10 – about the bases for his contention that the termination was "widely available" prior to the publication of the Article is testimony that is critical to Amgen's defense.

Because of the unique elements of Rule 10b-5 claims in shareholder class actions like this one, and because of the unique defenses that may be asserted in these actions, courts have

---

being published in a clinical journal. *Id.* The court explained that "at least one analyst read the article and reported on it at length," and that "some analysts were aware" of the study prior to defendants' alleged misstatements. *Id.* at *7-8. As a result, the court held that defendants could not be liable for their alleged misstatements under the truth-on-the-market defense. *Id.* at *8.

5012848

recognized the importance of journalist testimony, and ordered such testimony, where a journalist's article forms part of a plaintiff's Rule 10b-5 claim.  *See, e.g.*, *Seahawk Deep Ocean Tech., Inc.*, 166 F.R.D. at 271 (requiring journalist to testify concerning accuracy of statements attributed to defendants where journalist's news article disseminated allegedly fraudulent statement incorporated as part of plaintiff's 10b-5 claim); *Application of Waldholz*, No. 87 CIV. 4296 KMW, 1996 WL 389261, at *2-4 (S.D.N.Y. July 11, 1996)  (denying motion to quash in a Rule 10b-5 action where the "Class predicates defendants' liability in part directly on the statement by [defendant] reported in [the journalist's] article").  Mr. Goldberg has not cited any cases to the contrary.

> 2.    *Amgen has exhausted reasonable alternative sources of information*

Mr. Goldberg wrongly contends that Amgen has failed to exhaust alternative sources of the information.  (Mot. at 10-13.)

*First*, there are no alternative sources to discover how and when *Mr. Goldberg* learned of the DAHANCA 10 termination.  There are also no alternative sources who can testify to his understanding – *i.e.*, as the author of the alleged corrective disclosure – that the news of the DAHANCA 10 termination was already public.  This information is uniquely in his possession.

*Second*, contrary to Mr. Goldberg's representations and as described in Section II.B above, Amgen has engaged in reasonable discovery concerning the extent of news on the DAHANCA 10 termination.[8]

---

[8] Mr. Goldberg maintains that Amgen must seek information from Dr. Michael Henke – an oncologist quoted in the Article and located in Germany – before Amgen may obtain evidence from Mr. Goldberg.  (Mot. at 6, 12.)  However, in *Hutira*, relied on by Mr. Goldberg, the court suggested that plaintiff contact sources discussed in the article "*some of whom may still live near Washington, D.C.*" in order to meet the exhaustion requirement.  *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 122 (D.D.C. 2002) (emphasis added).  By sharp contrast, Amgen has contacted each named source identified in the Article who resides in the United States.  Exhaustion requires attempts at discovery from *reasonable* alternatives; it does require Amgen to pursue

The cases Mr. Goldberg relies on are inapposite. Mr. Goldberg cites a string of cases where courts held that depositions of other witnesses should be taken prior to deposing a journalist. (*See* Mot. at 10-11.) A number of these cases concern a party using the journalist as a surrogate fact-finder when alternative sources were identified and never contacted.[9] (*See id.*) As described above, that is not the case here. Other cases relied on by Mr. Goldberg concern parties seeking information from a journalist solely for impeachment purposes.[10] (*See id.*) Again, that is not the case here.

Moreover, Mr. Goldberg's reliance on *Carey v. Hume*, 492 F.2d 631, 638 (D.C. Cir. 1974), for the proposition that "60 depositions may be appropriate before compelling reporter to testify" is misplaced. (*See* Mot. at 10.) In *Carey*, the D.C. Circuit *affirmed* the district court's order requiring the defendant-journalist to disclose his sources.[11] The journalist testified at his

---

discovery from a source who is not subject to the jurisdiction of any United States court.

[9] *See Shoen v. Shoen*, 5 F.3d 1289, 1297 (9th Cir. 1993) (plaintiffs failed to depose defendant-interviewee, the father of plaintiffs who was also the defendant in a defamation action, concerning statements defendant made); *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 8-9 (2d Cir. 1982) (quashing document subpoena requesting identities of confidential sources because government failed to ask in prior depositions if information concerning oil prices was communicated to news agency); *Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981) (appellants failed to depose four sources expressly identified by the government as having knowledge of a wiretap leak to a news agency); *Application of Behar*, 779 F. Supp. 273, 275 (S.D.N.Y. 1991) (journalist's testimony could not be necessary to plaintiff's FOIA proceeding against the IRS where IRS identified 18 other pieces of evidence beyond journalist's article, and plaintiff admitted article was irrelevant to any FOIA issue); *Hutira*, 211 F. Supp. 2d at 122 (requiring plaintiff to "attempt to contact the other individuals discussed in the article" before going forward with non-party journalist's deposition).

[10] *In re Application to Quash Subpoena to Nat'l Broad. Co.*, 79 F.3d 346, 351-354 (2d Cir. 1996) (plaintiffs sought out-takes from interview by NBC of a witness to use for impeachment purposes at trial, but plaintiffs failed to elicit the testimony during deposition of witness); *In re McCray*, 928 F. Supp. 2d 748, 758 (S.D.N.Y. 2013) (quashing document subpoena where defendants sought prior interviews of plaintiffs from non-party filmmakers solely to attack plaintiffs' credibility at trial and where defendants already had sworn prior testimony from plaintiffs that conflicted with publicly released interviews).

[11] The reference to requiring 60 depositions in *Carey* concerned a case cited in the opinion, *Baker*

deposition that his sources were all employees of plaintiff's union, stating that he knew one source personally and there was "[a]t least one more," but he did not disclose the identity of those sources. *Carey*, 492 F.2d at 638. The court explained that the national offices of the union are "manned by a very substantial number of employees" and the sources could have been anyone "from an office boy to a top officer. . . . We do not think that the concept of exhaustion of remedies relevant here is invoked by guide marks as vague as these. [The journalist's] own information as to the circumstances of the observations was so imprecise as to afford appellees no reasonable basis to know where to begin." *Id.* at 638-639. Similarly, Mr. Goldberg has provided Amgen with vague guide marks about whom he told about the DAHANCA 10 termination – unnamed securities analysts who "could have been a source" and "Wall Street" observers. (*See* Dixon Decl. ¶ 20; Goldberg Decl., Ex. A at 2.) Given the large number of securities analysts covering the biotechnology sector, (Dixon Decl. ¶ 23), Amgen cannot be required under the exhaustion requirement to depose each and every securities analyst and "Wall Street observer[]" to see if it was Mr. Goldberg who told them about the DAHANCA 10 termination.[12]

---

*v. F&F Inv.*, 470 F.2d 778 (2d Cir. 1972). *Carey*, 492 F.2d at 639. In *Carey*, the court merely noted that *Baker* concerned "some sixty defendant real estate agents" and that the court in *Baker* "obviously saw no reason why the defendants themselves could not be deposed for the same information" sought from the journalist, whose source was also identified as a real estate agent. *Id.*

[12] Mr. Goldberg contends that his deposition should at least await the conclusion of the upcoming depositions of investment managers and analysts. But Amgen has no way of knowing whether these upcoming depositions are of the same "Wall Street" observers and analysts with whom Mr. Goldberg admits to speaking before publication of his Article. Moreover, Amgen cannot wait until after these depositions to decide whether to depose Mr. Goldberg because the fact discovery cut-off in this case is August 14, 2015.

Amgen is not obligated to "carry out a 'wide-ranging and onerous discovery burden []

where the path is . . . ill-lighted." *Lee v. Dep't of Justice*, 401 F. Supp. 2d 123, 135 (D.D.C.

2005)  (quoting *Lee v. Dep't of Justice*, 287 F. Supp. 2d 15, 22 (D.D.C. 2003)).  Amgen has

contacted all named sources that are reasonably available.  Amgen cannot depose unnamed

securities analysts to determine if they spoke with Mr. Goldberg about the DAHANCA 10

termination prior to the publication of the Article.  Although Mr. Goldberg maintains that the

Court should require "as many as 60 depositions" before permitting Mr. Goldberg to be deposed,

that is quite simply not the law.  *See id.* (noting that exhaustion "requires only that 'reasonable'

sources of evidence be tapped.  It does not require proof positive that the knowledge exists

nowhere else on earth but in the minds of the journalists and their anonymous confidants."

(quoting *Lee*, 287 F. Supp. 2d at 23)).

Accordingly, the remaining reasonable source of known information is Mr. Goldberg.

### 3.    *Mr. Goldberg's testimony is not cumulative or duplicative*

In an attempt to downplay the importance of his knowledge, Mr. Goldberg argues that

any testimony he may give will be "cumulative or duplicative" because "the information

[concerning DAHANCA 10] was already on Google."  (*See* Mot. at 14.)  According to him,

"[w]hat arguably matters is only whether the information Mr. Goldberg reported was available

before Mr. Goldberg reported it."  (*Id.*)  That is incorrect.

As explained in Section IV.B.1 above, the public availability of the DAHANCA 10

termination is of central importance to Amgen's defense.  Further, in ruling on Amgen's motion

to dismiss, the Court required Amgen to present more than just the fact that the DAHANCA 10

termination was available on the Internet prior to Mr. Goldberg's Article.  The Court stated "that

the DAHANCA 10 results were posted on [DAHANCA's] website does not mean the market

*knew* of these results."  *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1030-31 (C.D. Cal.

2008)  (emphasis in original).  Through testimony from Mr. Goldberg regarding his admitted conversations with observers on "Wall Street" before publication of the Article, Amgen may show the extent to which the DAHANCA 10 termination was known *to the market* prior to the Article's publication.

4.      *The policy behind the reporter's privilege is not implicated by the information Amgen seeks from Mr. Goldberg*

Moreover, the primary rationale behind the reporter's privilege is to protect reporters from becoming surrogate fact-finders and deter sources from disclosing confidential information to the press.  (*See* Mot. at 2, 9.)  That policy is not implicated in the information Amgen seeks. Amgen is not using Mr. Goldberg as a work around for its own discovery efforts.  It has already undertaken reasonable discovery concerning the disclosure of the DAHANCA 10 termination, and it is not seeking the names or identities of Mr. Goldberg's privileged sources.  Instead, Mr. Goldberg's unique knowledge and information go to the heart of a critical event in this case – a corrective disclosure.  His own belief on the availability of the DAHANCA 10 termination and with whom he shared news of the termination prior to publication are critical and highly relevant.

C.      **Mr. Goldberg's Request for Attorneys' Fees Is without Merit**

If the Court grants Mr. Goldberg's Motion, Mr. Goldberg is not entitled to attorneys' fees under Rule 45.  Amgen has taken multiple "reasonable steps to avoid imposing an undue burden or expense" on Mr. Goldberg.  FED. R. CIV. PRO. 45(d)(1); s*ee also Rendon Grp., Inc. v. Rigsby*, No. 1:10-mc-00164 (HHK/JMF), 2010 WL 4627647, at *1 (D.D.C. Nov. 8, 2010) ("Rule 45(c)(1) does not explicitly require expenses to be paid if a party is not entirely successful in its subpoena. . . .  I cannot find that the attorney who served that subpoena failed to take reasonable steps to avoid imposing what would have to be an *undue* burden [on non-party].").  As already

5012848

described at length, Amgen engaged in reasonable discovery before seeking Mr. Goldberg's

deposition.  Amgen has also conferred in good faith with Mr. Goldberg's counsel to limit the

topics for Mr. Goldberg's deposition, and has consistently offered to accommodate

Mr. Goldberg's schedule so as to minimize any possible convenience to him.  (Colgate Decl.,

Exs. 5B, 5D.)  Amgen remains willing to do so.  There is no basis for an award of

attorney's fees.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Amgen respectfully requests that the Court deny Mr.

Goldberg's motion to quash and order Mr. Goldberg to attend his deposition within 14 calendar

days of the Court's order.


Dated:  July 9, 2015                                Respectfully submitted,


By:      */s/ Ryan L. Ford*
         Ryan L. Ford (D.C. Bar No. 1004141)
         *ryan.ford@hoganlovells.com*
         **HOGAN LOVELLS LLP**
         555 Thirteenth Street, NW
         Washington, DC 20004
         Tel: (202) 637-5600

         *Attorneys for Amgen, Inc.*

         **HUESTON HENNIGAN LLP**
         John C. Hueston (Cal. Bar No. 164921) (*pro hac vice* application pending)
         *jhueston@hueston.com*
         Moez M. Kaba (Cal. Bar No. 257456) (*pro hac vice* application pending)
         *mkaba@hueston.com*
         Douglas J. Dixon (Cal. Bar No. 275389) (*pro hac vice* application pending)
         *ddixon@hueston.com*

- 20 -

523 West Sixth Street, Suite 400
Los Angeles, CA 90014
Tel.: (213) 788-4340

*Attorneys for Amgen Inc.,*
*Kevin W. Sharer, Richard D. Nanula,*
*Roger M. Perlmutter and George J. Morrow*

**IRELL & MANELLA LLP**
Glenn K. Vanzura (Cal. Bar No. 238057)
(*pro hac vice* application pending)
*gvanzura@irell.com*
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Tel.: (310) 277-1010

*Attorneys for Amgen. Inc.*

- 21 -